IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Walker D. Miller

Civil Action No. 06-cv-01416-WDM-KLM

JOSEPH BRAZIER, LTD., a United Kingdom corporation,

      Plaintiff,

v.

SPECIALTY BAR PRODUCTS COMPANY, a Pennsylvania corporation,

      Defendant.

_____

SPECIALTY BAR PRODUCTS COMPANY, a Pennsylvania corporation,

      Counterclaim Plaintiff,

v.

JOSEPH BRAZIER, LTD., a United Kingdom corporation,
FNGB CORP., a Nevada corporation, and
KARL CLARK LIPPARD,

      Counterclaim Defendants.

_____

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

_____

      This matter is before me on defendant's Motion for Summary Judgment (Dkt.

# 34) and plaintiff's Motion for Partial Summary Judgment (Dkt. # 42), both filed on

March 6, 2007.  The motions are fully briefed and ripe for disposition.

**I.      BACKGROUND**

      Plaintiff Joseph Brazier, Ltd. ("JBL") supplies engineering designs and

manufactures shotguns.  Lippard Depo. Vol. I, Ex. A-1 to Def.'s S.J. Br., at 63.  In late

2002 or early 2003, JBL and Defendant Specialty Bar Products Company ("SBP")
explored forming a business relationship whereby SBP would produce shotgun barrels
for JBL.  *Id.* at 102–03.  To that end, JBL faxed a proposed non-disclosure agreement
("NDA") to SBP in April 2003, which provided that the parties would keep certain
information confidential, including designs, plans, manufacturing systems and parts,
and financial information.  Ex. 1 to Pl.'s S.J. Br. (Dkt. # 42).  Brian Murray, president
and chief executive officer of SBP, signed the NDA on June 5, 2003, and returned the
document to JBL.  *Id.*  The NDA was never signed by a representative of JBL.  *See id.*

On July 2, 2003, SBP entered into an agreement with JBL (the "2003 Purchase
Order") to manufacture shotgun barrels for JBL.  Ex. A-16 to Def.'s S.J. Br.  The
production of such barrels involves two stages: first, holes are drilled into a blank piece
of steel (the "boring" stage); second, the blanks are machined into the shape of a
shotgun barrel (the "profiling" stage).  Lippard Depo. Vol. I at 109.  The 2003 Purchase
Order called for SBP to both bore and profile the blanks to produce twenty-five 20-
gauge barrels, with a potential "second run" of twenty-five 12-gauge barrels.  Ex. A-16.
Although the 2003 Purchase Order stated that SBP was to ship the barrels "as ready,"
the "learning curve" involved in the manufacturing process prevented the parties from
setting a specific delivery date.  *Id.*; Lippard Depo. Vol. I at 170.

When the parties met to discuss the status of the project on April 8, 2004, Frank
Milsak, a representative of SBP, showed two prototypes to Karl Lippard, JBL's
managing director and sole shareholder.  *Id.* at 194.  Milsak explained that SBP was
having difficulty profiling the barrels, and Lippard found that the prototypes had "no

comparison to the original drawings or specifications." *Id.* at 195, 198. The parties

therefore agreed to bring in a third party, Versatile Machining ("Versatile"), to profile the

barrels. *Id.* at 198–199.

JBL and SBP entered into a second agreement on July 19, 2004 (the "2004

Purchase Order"), which reflected Versatile's role in profiling the barrels. Ex. A-17 to

Def.'s S.J. Br. The 2004 Purchase Order called for SBP to bore blanks for twenty-five

20-gauge barrels and ship the bored blanks to Versatile for profiling, at a price of $900

per barrel.[1] *Id.* The payment terms were stated as "Net 30," meaning payment by JBL

was due within 30 days of delivery. *Id.*; Lippard Depo. Vol. I at 211. The 2003 and

2004 Purchase Orders contained the same "P/O #." Ex. A-17. In addition, the 2004

Purchase Order stated that "[n]ew contract is for barrel boring only" and stated in the

description field that the order had been "[a]mended to boring only." *Id.*

On August 10, 2004, SBP shipped the first two blanks to Versatile for profiling.

Def.'s Countercl. at 7. On August 18, 2004, Lippard sent Milsak two emails discussing

the required specifications for the barrels and the need to adjust the machining in light

of the condition of the first two drilled blanks. Ex. 10 to Pl.'s Resp. In its reply email,

SBP acknowledged the need to cut to the "agreed size" and stated that "subsequent

blanks will of course be right." *Id.* During the fall of 2004, SBP shipped 25 more blanks

---

[1] As in the 2003 Purchase Order, there was also a second run order for twenty-five 12-gauge
barrels, to be produced after completion of the initial twenty five barrels. There is no record of SBP's
reaching the "second run," and neither party addresses the issue in the pleadings or briefs. Thus, the
"second run" provision is immaterial to the motions currently before the Court.

to Versatile for profiling as follows: two were shipped on September 27th, six on October 18th, and 17 on October 29th. Def.'s Countercl. at 7–8.

JBL did not pay SBP for any of the 27 blanks received by Versatile for profiling. Accordingly, Milsak emailed Lippard on June 14, 2005, requesting payment for the outstanding balance of $24,300. Ex. 12 to Pl.'s Resp. Lippard replied the next day in an email that detailed many problems with the drilled blanks and stated that JBL did not owe SBP payment for the nonconforming goods. *Id.*

Lippard filed a voluntary petition for bankruptcy on March 31, 2004. Ex. A-9 to Def.'s S.J. Br. Lippard did not list any legal claims by JBL as assets in its bankruptcy schedules. *See* Ex. A-10. However, Lippard did list a 100% ownership interest in JBL. *Id.* A final decree was entered in that case on November 16, 2006.

JBL, Lippard, and FNGB Corp., a company 90%-owned by Lippard, sued SBP in state court on June 16, 2006. After the case was properly removed to this Court, JBL filed an amended complaint in which Lippard and FNGB Corp. were removed as plaintiffs and in which JBL asserted seven causes of action against SBP: (1) breach of the 2003 Purchase Order; (2) breach of the 2004 Purchase Order; (3) breach of express warranty; (4) breach of implied warranty of fitness for a particular purpose; (5) breach of engineering services contract; (6) quantum meruit; and (7) breach of the non-disclosure agreement. Am. Compl. (Dkt. # 27), ¶¶ 25–36. SBP filed a counterclaim against all three original plaintiffs for breach of the 2004 Purchase Order.

SBP moves for summary judgment on JBL's claims, asserting they are all barred by the doctrine of judicial estoppel and that all but two of the claims fail on their merits.

JBL filed a motion for partial summary judgment relating to its NDA claim, contending the NDA is a valid and binding agreement as a matter of law.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate under F.R.Civ.P. 56(c) only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the non-moving party.  *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).  To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment."  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

III.    **ANALYSIS**

A.    **Judicial Estoppel**

SBP contends that all of JBL's claims, regardless of their individual merit, are barred by the equitable doctrine of judicial estoppel. This doctrine generally provides that, where a party assumes and successfully maintains a certain position in a legal proceeding, he may not thereafter assume a contrary position "simply because his interests have changed." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (citation omitted). In determining whether to apply judicial estoppel, a court should consider whether: (1) a party's later position is clearly inconsistent with its earlier position; (2) that party has succeeded in persuading a court to accept that party's earlier position; and (3) that party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005).

The Tenth Circuit has held that judicial estoppel may be appropriate to bar a party from asserting a legal claim when that party files for bankruptcy and fails to disclose its claims to the bankruptcy court. *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1159 (10th Cir. 2007); *accord Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) ("In the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements."). In this case, Lippard, not Plaintiff JBL, filed for bankruptcy; however, SBP argues JBL and Lippard are alter egos of each other such that Lippard was required to but did not disclose JBL's potential causes of

6

action, including JBL's claims against SBP, in his Chapter 11 bankruptcy schedule. *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (individual shareholder may be held liable for acts of corporation when alter ego relationship exists between them such that corporation is a "mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist") (quotation omitted).

SBP cites no case law expressly holding that judicial estoppel may be used to bar undisclosed claims brought by an alleged alter ego of a debtor in a bankruptcy proceeding, as opposed to the debtor himself, and I have not located any. Nevertheless, even assuming judicial estoppel could apply in such circumstances, I find that SBP has failed to demonstrate in accordance with the first *Johnson* factor that Lippard's failure to disclose JBL's claims against SBP in his bankruptcy proceedings was "clearly inconsistent" with JBL's subsequently asserting those claims. There is no indication that JBL was alleged or found to be Lippard's alter ego in the bankruptcy case despite Lippard's disclosure to the bankruptcy court of his 100% ownership interest in JBL. I also take note of timing. Lippard filed his petition in April 2004, long before the purchase order and subsequent production triggered this litigation. In light of the equitable nature of judicial estoppel, I conclude that Lippard's failure to disclose the claims of an entity, arising after the petition is filed, that could potentially be alleged and found at some later date to be the bankrupt's alter ego does not bar JBL's claims in this case. Accordingly, I decline to apply the discretionary doctrine of judicial estoppel and turn to the merits of the parties' claims.

**B.      Breach of the 2004 Purchase Order**

SBP and JBL have each brought a breach of contract claim against the other based on the 2004 Purchase Order.  A contract for the sale of goods, like the 2004 Purchase Order at issue here, is governed by Title 4, Article 2 of the Colorado Revised Statutes, "which substantially adopts the Uniform Commercial Code" (hereinafter "UCC").  *Jelen & Son, Inc. v. Bandimere*, 801 P.2d 1182, 1184 (Colo. 1990).

Under the UCC, once a contract is formed, it is the obligation of the seller to transfer and deliver the goods and the obligation of the buyer to accept the goods and pay the seller in accordance with the contract.  C.R.S. § 4-2-301.  If the goods as delivered fail in any respect to conform to the contract, a buyer may (a) reject the whole, (b) accept the whole, or (c) accept any commercial unit or units and reject the rest.  *Id.* § 4-2-601.  A buyer may reject goods within a reasonable time after the seller tenders the goods and must seasonably notify the seller of the rejection.  *Id.* § 4-2-602(1).  The buyer has no further obligation with regard to goods that have been rightfully rejected.  *Id.* § 4-2-602(2)(c).  A buyer accepts goods when, after a reasonable opportunity to inspect them, the buyer: (1) signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; (2) fails to make an effective rejection; or (3) does any act inconsistent with the seller's ownership.  *Id.* § 4-2-606(1).  The buyer must pay at the contract rate for any goods accepted.  *Id.* § 4-2-607(1).

Once tender has been accepted, the buyer must notify the seller of any breach within a reasonable time after he discovered or should have discovered any breach or

be barred from any remedy. *Id.* § 4-2-607(3)(a). In certain circumstances, a buyer may revoke his acceptance of nonconforming goods if the nonconformity substantially impairs the value of the goods to him. *Id.* § 4-2-608(1). However, revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the grounds for it and before the buyer substantially changes the condition of the goods. *Id.* § 4-2-608(2). Moreover, the revocation is not effective until the buyer notifies the seller of it. *Id.*

JBL claims SBP breached the 2004 Purchase Order by delivering goods that did not conform with the contractual specifications. SBP claims that JBL accepted the drilled blanks, did not effectively revoke its acceptance, and thus is required to pay SBP the contract price of $900 per blank. As discussed below, I conclude that JBL failed to effectively reject the delivered blanks and failed to revoke its acceptance of the blanks, and that SBP is therefore entitled to summary judgment on its breach of contract claim.

### 1. *JBL's Purported Rejection of the Drilled Blanks*

Viewing the evidence in the light most favorable to the nonmoving party (JBL), the 27 drilled blanks produced by SBP and delivered to Versatile did not conform to specifications, as there is evidence that the blanks were oversized and the wrong shape. Lippard Depo. Vol. I at 243–44, Vol. II at 369. JBL argues that it therefore rejected the nonconforming goods in accordance with the UCC. As noted above, the UCC provides that rejection "is ineffective unless the buyer seasonably notifies the seller." C.R.S. § 4-2-602(1).

The question of what constitutes effective notice of rejection depends on the nature, purpose, and circumstances of such notice, and there is no statutorily prescribed form. *W. Conference Resorts, Inc. v. Pease*, 668 P.2d 973, 976 (Colo. App. 1983) (buyer effectively rejected aircraft by notifying seller by phone that the aircraft was unacceptable "immediately" upon learning it had been in a previous accident and within the agreed-upon time period for inspection of the aircraft); *see also Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo. 1980) (notice effective when buyer of farm equipment encountered problems and immediately notified seller thereof). Notice is sufficient if it gives the seller an opportunity to correct the defect and prepare for negotiations and litigation, and if it protects the seller against claims asserted after it is too late to investigate. *White v. Mississippi Order Buyers, Inc.*, 648 P.2d 682, 684 (Colo. App. 1982) (notice of rejection insufficient where buyer of defective herd of cattle sold cattle to mitigate losses prior to giving notice to seller because seller could not correct and negotiate).

JBL contends it seasonably notified SBP of its rejection of the drilled blanks in the August 2004 emails sent by Lippard to Milsak. Ex. 10 to Pl.'s Resp. It is undisputed that Lippard sent these emails immediately after SBP delivered the first two blanks to Versatile. However, while these emails indicate Lippard's dissatisfaction with the first two blanks and a need to adjust the future blanks, the emails could not have constituted a rejection of the 25 yet-to-be-delivered blanks. Thus, although the issue of whether a buyer properly rejected goods is ordinarily a question of fact, *Pease*, 668 P.2d at 976, I find that no reasonable factfinder could conclude that the August 2004

emails constituted a rejection of any but the first two blanks. Thus, as a matter of law JBL did not reject the 25 drilled blanks delivered in September and October 2004 because it never notified SBP of such a rejection as required by C.R.S. § 4-2-602(1).

## 2. *JBL's Purported Revocation of Acceptance of the Drilled Blanks*

Under the UCC, JBL accepted the drilled blanks in two ways. First, as discussed above JBL failed to make an effective rejection of the blanks after having a reasonable time to inspect them. C.R.S. § 4-2-606(1)(b). Second, JBL acted inconsistently with SBP's ownership of the blanks. *Id.* § 4-2-606(1)(c). It is undisputed that, after delivery, Versatile profiled 12 of the blanks, ten of which JBL incorporated into shotguns and sold. Lippard Depo. Vol. I at 236. Although the remaining blanks were not profiled, JBL did not return them to SBP; in fact, JBL refused to return them even after SBP offered to pay for the cost of shipping them back to SBP's plant. *Id.* at 235, 290. JBL's resale of a portion of the blanks and retention of all of them without timely complaint is inconsistent with SBP's ownership and thus constitutes acceptance of the blanks. *See Vanadium Corp. of Am. v. Wesco Stores Co.*, 308 P.2d 1011, 1014 (Colo. 1957) (buyer accepted turkeys by taking physical possession and control of them, partially freezing them, and retaining them for five days).

JBL argues that, even if it accepted the drilled blanks, it properly revoked its acceptance. However, as is the case with rejection, revocation of accepted goods "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it" and "is not effective until the buyer notifies the seller of it." C.R.S. § 4-2-608(2). JBL asserts that it "notified SBP of its revocation of acceptance in

11

a timely manner," but cites *no* record evidence in support of that assertion. Pl.'s Resp. at 10. Certainly, the same August 2004 emails discussed above could not have constituted revocation of acceptance of blanks that had yet to be delivered.

I also note the email Lippard sent Milsak in June 2005 in response to Milsak's request for payment for the delivered blanks. Ex. 12 to Pl.'s Resp. Sent eight months after Versatile received the last of the 27 drilled blanks, the email addresses the problems Lippard has with the drilled blanks and their alleged nonconformity with contract specifications. Assuming this was an attempt by JBL to revoke its acceptance of the blanks, it did not occur within a reasonable time after JBL discovered or should have discovered the grounds for revocation. C.R.S. § 4-2-608(2). What constitutes a reasonable time is generally a question of fact to be measured by all the circumstances of the case. *Stroh v. Am. Recreation & Mobile Home Corp. of Colo.*, 530 P.2d 989, 992 (Colo. App. 1975). However, even allowing JBL time to inspect the blanks, I conclude that the unexplained eight-month delay between SBP's delivery of the banks and JBL's notification of their nonconformity was unreasonable as a matter of law and that the June 2005 email was not a timely revocation of acceptance. Moreover, revocation must occur "before any substantial change in the condition of the goods which is not caused by their own defects." C.R.S. § 4-2-608(2). Under this provision, even if the eight-month delay was reasonable, which it was not, JBL could not revoke its acceptance of the 12 blanks that had been profiled.

Citing *Cissell Manufacturing Co. v. Park*, JBL argues that "no formal notice of revocation" is necessary. 36 P.3d 85, 89 (Colo. App. 2001). Rather, an effective

revocation "should fairly apprise the seller that the buyer wants to give back the goods and receive a substitute or money in return." *Id.* However, the August 2004 email does not so advise SBP and, in any event, was sent before all but two of the blanks were delivered. While the June 2005 email may qualify as a revocation in substance, the content of the email does not cure its untimeliness. Thus, I find as a matter of law that JBL did not comply with the requirements of C.R.S. § 4-2-608 and thus did not revoke its acceptance of the drilled blanks. Accordingly, SBP is entitled to summary judgment on JBL's claim that SBP breached the 2004 Purchase Order and is also entitled to summary judgment on its claim that JBL breached the agreement.

### 3. *SBP's Damages*

Because JBL has failed to pay the price of the accepted blanks as it became due, SBP is entitled to recover the contract price of those goods. C.R.S. § 4-2-709(1)(a). The 2004 Purchase Order provides for 25 blanks to be produced and delivered at $900 per blank, which totals $22,500. Ex. A-17. SBP, however, asserts it is entitled to recover $24,300, which reflects the total price for all 27 delivered blanks. SBP alleges the 2004 Purchase Order was modified on December 22, 2004 to reflect the two additional blanks. Def.'s Countercl. at 8. However, SBP fails to cite evidence in the record to support the existence or content of the modification. Absent such evidence, SBP is entitled as a matter of law to recover $900 per blank for the 25 blanks reflected in the 2004 Purchase Order, for a total of $22,500.

**C.    Breach of 2003 Purchase Order**

JBL brings a separate breach of contract claim based on the original 2003 Purchase Order, which called for SBP to manufacture 25 shotgun barrels for JBL. Ex. A-16 to Def.'s S.J. Br.  Under that original agreement, SBP was responsible for both boring and profiling the blanks.  *Id.*  It is undisputed that SBP never produced any shotgun barrels under the 2003 Purchase Order.  SBP, however, argues it is entitled to summary judgment on this claim because "the July 2004 purchase order amended and replaced the 'original contract' [*i.e.*, the 2003 Purchase Order]."  Def.'s S.J. Br. at 3. JBL contends there is no evidence that JBL intended to release SBP from any liability under the 2003 Purchase Order and that SBP accordingly remains responsible for its obligations thereunder.

Generally, interpretation of contractual language is a question of law.  *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000).  The Tenth Circuit was previously called upon to apply Colorado law regarding the effect of a modification agreement in *Caven v. American Federal Savings & Loan Association of Colorado*, 837 F.2d 427, 430 (10th Cir. 1988).  Recognizing that Colorado law was unclear, the *Caven* court determined that Utah law "correctly state[d] general contract law relating to modification agreements" and concluded that the same principles applied under Colorado law.  *Id.*  Specifically, the court held that "[i]t is well-settled law that the parties to a contract may, by mutual consent, alter all or any portion of that contract by agreeing upon a modification thereof.  Where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and

14

any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused." *Id.* (citing *Rapp v. Mountain States Tel. & Tel. Co.*, 606 P.2d 1189, 1191 (Utah 1980)).

Applying those principles here, I find that the terms of the 2003 Purchase Order were clearly modified by the 2004 Purchase Order. Both purchase orders were labeled with the same purchase order number, and the 2004 Purchase Order stated in the description that the order had been "[a]mended to barrel boring only." Exs. A-16 & A-17 to Def.'s S.J. Br. Lippard himself testified that the 2004 Purchase Order "amended" the previous order. Lippard Depo. Vol. I at 214. In addition, SBP's obligation under the 2003 Purchase Order to produce 25 shotgun barrels, which necessarily included both boring the barrel holes and profiling the barrels, conflicts with SBP's obligations under the contract as modified by the 2004 Purchase Order, which clearly limited the scope of SBP's work to "barrel boring only." Ex. A-17. Thus, SBP's contractual obligations under the 2003 Purchase Order, to the extent they involved more than boring the required quantity of blanks, are "deemed waived or excused" by the parties' modification.

JBL argues that, because SBP provided no consideration to JBL for the modification, the amended contract does not release SBP from the 2003 liabilities. Pl. S.J. Resp. Br. at 3. However, the UCC clearly provides that "[a]n agreement modifying a contract . . . needs no consideration to be binding." C.R.S. § 4-2-209(1). Accordingly, I conclude that SBP's obligation under the 2003 Purchase Order to produce 25 bored and profiled barrels is deemed excused by the parties' modification.

Because summary judgment is proper on JBL's claims for beach of the 2004 Purchase

Order and because SBP has no greater obligation under the 2003 Purchase Order,

summary judgment is also proper on JBL's claims for breach of the 2003 Purchase

Order.

**D.      Breach of Warranty**

JBL asserts causes of action against SBP for breach of express and implied

warranties.  JBL's ability to proceed on these claims hinges on whether JBL has

complied with the UCC's notice provisions, which provide in pertinent part that

"[w]here a tender has been accepted," as is the case here, "[t]he buyer must, within a

reasonable time after he discovered or should have discovered any breach, notify the

seller of breach or be barred from any remedy."  C.R.S. § 4-2-607(3)(a).  Notice of a

breach is adequate "if it is sufficient to provide [the] seller with the opportunity to

investigate [the] buyer's complaint, to correct an alleged defect, or to effect a settlement

through negotiation.  *Hoffman's Double Bar Pine Nursery v. Fyke*, 633 P.2d 516, 518

(Colo. App. 1981) (citation omitted).

JBL argues that it made "contemporaneous complaints" to SBP about the blanks,

but again does not support that contention with citations to specific evidence in the

record.  Pl.'s Resp. at 12.  To the extent JBL is referring to the August 2004 emails as

constituting notice to SBP of an alleged breach, such reliance is misplaced.  However,

while the August 2004 communications discussed adjustments that were to be made to

the remaining blanks, they did not notify or accuse SBP of a breach of warranty.  Again,

the 2004 emails could not have notified SBP of a breach of warranty with respect to those yet-to-be-delivered blanks.

JBL also relies on the June 2005 email, which as discussed above was sent eight months after Versatile received the last of the blanks contemplated in the parties' agreement. Ex. 12 to Pl.'s Resp. Again, JBL offers no explanation as to why it took eight months to notify SBP of the blanks' alleged nonconformity with the contractual specifications. Indeed, it appears JBL notified SBP of its complaints at that point only as a response to SBP's request for payment. Thus, I find that, with the exception of the first two blanks for which the August 2004 email could serve as a notice of breach, the undisputed evidence shows that JBL did not provide timely and reasonable notice to SBP of an alleged breach. Thus, SBP is entitled to summary judgment on JBL's breach of warranty claims.

### E. Breach of Engineering Services Contract and Quantum Meruit

In its fifth and sixth causes of action, JBL claims that SBP breached a contract the parties entered into for the provision of engineering services by JBL. Am. Compl. at 6. JBL also claims that, if no such contract existed, JBL nevertheless provided such services to SBP, SBP benefitted from those services, and JBL is entitled to recover under a theory of *quantum meruit* for the reasonable value of those services. *Id.* at 6–7. SBP's only argument with respect to these claims is that they are barred under the doctrine of judicial estoppel. Because judicial estoppel does not apply, SBP is not entitled to summary judgment on these claims.

**F.      Breach of Non-Disclosure Agreement**

A non-disclosure agreement is a contract to protect trade secrets.  *See* C.R.S.

§ 8-2-113(2)(b).  To prevail on its claim for breach of the NDA, as with any breach

of contract claim, JBL must prove four elements: (1) the existence of a valid and

binding contract; (2) performance by the plaintiff (JBL), or some justification for

nonperformance; (3) failure to perform the contract by defendants (SBP); and

(4) damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.

1992).  SBP claims it is entitles to summary judgment on this claim because no genuine

issue of material fact exists as to the first, third, or fourth elements.  JBL filed a cross-

motion for partial summary judgment on this claim, arguing that the first element,

existence of a binding contract, has been established as a matter of law.

The existence of a contract is established if the evidence shows that the parties

agreed upon all essential terms.  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d

882, 888 (Colo. 1986).  The agreement is evidenced by the parties' "manifestations of

mutual assent."  *Id.* (citing Restatement (Second) of Contracts § 17(1)).  The evidence

shows that JBL faxed the proposed NDA to Brian Murray of SBP on April 29, 2003,

accompanied by a cover sheet requesting Murray's signature, and that Murray signed

the NDA and returned it to JBL on June 5, 2003.  Exs. 1 & 3 to Pl.'s S.J. Br.  SBP

contends that a binding agreement does not exist because JBL never signed the

contract and there was thus no mutual assent.

While the purpose of the signature is to demonstrate mutual assent, it is not

always required to create a binding agreement.  *City & County of Denver v. Adolph*

18

*Coors Co.*, 813 F. Supp. 1476, 1480 (D. Colo. 1993). Mutual assent may also be shown "by the conduct of the parties" and is to be judged "by overt acts and words rather than by the hidden or secret intention of the parties." *Id.* (citations omitted). Moreover, "the issue of intent is one that can only rarely be resolved by means of a summary judgment." *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994). Accordingly, I conclude that the issue of whether the NDA constituted a binding agreement is one of fact for the jury. As a result, summary judgment for either party based on this element is inappropriate.[2]

SBP next argues that, assuming a binding NDA exists, SBP is nevertheless entitled to summary judgment because JBL cannot establish that SBP failed to perform under the agreement. The NDA provided that "designs, plans, drawings, and or manufacturing systems and parts . . . shall be kept confidential from the general public." Ex. 1 to Pl.'s S.J. Br. SBP does not dispute that it displayed a prototype of the barrel SBP was manufacturing for JBL at a trade show attended by members of the National Rifle Association. I conclude that whether SBP's display of the prototype constituted a breach of the NDA is a question of fact that does not warrant summary judgment.

Finally, SBP argues it is entitled to summary judgment because JBL has provided no evidence of any damages resulting from SBP's alleged breach of the NDA. To show actual damages in a breach of contract action, the plaintiff must present evidence of both the existence and the cause of damages. *City of Westminster v.*

---

[2] The Court, therefore, need not address the issue of whether summary judgment on part of a claim is procedurally proper.

*Centric-Jones Constructors*, 100 P.3d 472, 477 (Colo. App. 2003). However, proof of actual damages is not an essential element of a claim for breach of contract. *Overland Dev. Co. v. Marston Slopes Dev. Co.*, 773 P.2d 1112, 1114 (Colo. App. 1989). Thus, if a plaintiff proves a contract was breached, he is entitled to an award of nominal damages, even in the absence of proof of any actual damages. *Id.*; *see also Doyle v. McBee*, 420 P.2d 247, 250 (Colo. 1966).

At this point, the record does not appear to support an award of actual damages. However, in light of *Overland*, summary judgment on that basis is inappropriate. *See Topel*, 38 F. Supp. 2d 1233, 1241 (D. Colo. 1999) (refusing to enter summary judgment on breach of contract claim despite the fact that the plaintiff had "demonstrated [a] questionable basis for other than nominal damages"). Therefore, because the questions of whether the NDA is a valid agreement and whether SBP breached the agreement must be resolved by a jury, and because the possibility of nominal damages therefore exists, SBP is not entitled to summary judgment on JBL's cause of action for breach of the non-disclosure agreement.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff JBL's Motion for Partial Summary Judgment (Dkt. # 41) is DENIED. Defendant SBP's Motion for Summary Judgment (Dkt. # 34) is GRANTED IN PART and DENIED IN PART in accordance with this order. SBP is entitled to summary judgment against JBL on its breach of contract claim in the amount

of $22,500.  JBL's first, second, third, and fourth claims for relief are DISMISSED WITH

PREJUDICE.  JBL's fifth, sixth, and seventh claims for relief remain pending.

DATED:  March 21, 2008.

BY THE COURT:

s/ Walker D. Miller

_____
Walker D. Miller
United States District Judge