IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01416-WDM-KLM

JOSEPH BRAZIER, LTD, a United Kingdom corporation,
FNGB, CORP., a Nevada corporation, and
KARL CLARK LIPPARD,

    Plaintiffs,

v.

SPECIALTY BAR PRODUCTS COMPANY, a Pennsylvania corporation,

    Defendant.
_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on **Defendant Specialty Bar Products Company's Motion to Enforce Settlement Agreement** [Docket No. 76; Filed August 20, 2008] (the "Motion"). Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C. COLO.L.Civ.R. 72.1.C., the matter has been referred to this Court for recommendation. The Court has reviewed the Motion, Plaintiffs' Response [Docket No 83; Filed September 12, 2008], Defendant's Reply [Docket No. 84; Filed September 25, 2008], the arguments of counsel at the hearing held on December 10, 2008, the entire case file and applicable case law and is sufficiently advised in the premises. For the reasons set forth below, the Court respectfully **RECOMMENDS** that the Motion be **GRANTED**.

**I.    Statement of the Case**

1

The following facts appear to be essentially undisputed. Plaintiffs filed their Complaint [Docket No. 1-2] in the District Court of El Paso County, Colorado on June 16, 2006. Plaintiffs' allegations arise from a transaction with Defendant related to the manufacture and sale of gun barrels. *Complaint* [#1-2] at 2. Plaintiffs alleged that Defendant breached two contracts and a non-disclosure agreement ("NDA") and sought a declaration of the rights, duties and liability of the parties arising out of their relationship. *Id.* at 3. Defendant removed the case to this Court on July 20, 2006, asserting jurisdiction pursuant to 28 U.S.C. § 1332 [Docket No. 1]. On July 20, 2006, Defendant filed a compulsory counterclaim alleging breach of contract [Docket No. 4]. By Order dated March 21, 2008, District Judge Miller dismissed four of Plaintiffs' claims with prejudice, and entered judgment as a matter of law on Defendant's counterclaim, leaving three of Plaintiffs' claims pending [Docket No. 67].

Defendant states that after the March 21, 2008 Order, it approached Plaintiffs "in order to resolve [Plaintiffs'] remaining claims." *Motion* [#76] at 2. By letter dated June 13, 2008, Plaintiffs offered to resolve the pending litigation by:

> (a) pay[ing Defendant] the sum of twenty-two thousand, five hundred U.S. Dollars ($22,500), (b) dismiss[ing] all claims with prejudice and sign[ing] a release covering the time period through the date of the release [] *in exchange for* (a) a full release of liability from [Defendant's] counterclaims (including any right to costs associated therewith), (b) a signed agreement between [Plaintiffs] and [Defendant] stating that the NDA is valid and continues to protect [Plaintiffs'] trade secrets from unauthorized disclosure or use, and (c) dismiss[al of Defendant's] claims with prejudice.

*Motion* [#76] at Ex. A-2, p. 3 (emphasis in original). Defendant responded to Plaintiffs' offer by letter dated June 25, 2008, stating "[t]his letter confirms that we agreed in principle to

2

a settlement of the above-referenced case, as discussed yesterday."[1]  *Id.* at Ex. A-3, p. 3. Defendant's June 25th letter provided the following "clarifications" to the "material terms" of settlement, as set forth in Plaintiffs' June 13th letter:

> (1) the parties will exchange general mutual releases; (2) the non-disclosure issue will be addressed in the settlement agreement; (3) the settlement agreement will include recitals related to the nature and scope of [Defendant's] work; and (4) [Defendant] will file a satisfaction of judgment (in lieu of dismissing its counterclaim with prejudice) upon the tender of the $22,500.00.

*Id.*  Defendant also stated that it would "draft and circulate a settlement agreement/general mutual release that more fully and formally memorializes the settlement agreement."  *Id.* Defendant then notified the Court that the case had settled, and by Minute Order dated June 25, 2008, the Court vacated the trial date and all case deadlines [Docket No. 73].  By email dated July 8, 2008, Plaintiffs stated that they were "particularly anxious" to review the proposed settlement agreement in light of the fact that the trial had been vacated.  *Motion* [#76] at Ex. A-4, p. 2.  On July 23, 2008, Defendant emailed a revised settlement agreement to Plaintiffs, and stated that the revised agreement "makes the change, per your request, that we do not file a satisfaction of judgment but instead simply file a stipulation of dismissal."  *Id.* at Ex. A-6, p. 2.

Next, Defendant emailed Plaintiffs "a revised, final draft of the settlement agreement" on August 7, 2008.  *Id.* at Ex. A-7.  Defendant stated that "[t]his agreement incorporates every material term that the parties agreed to in June 2008."  *Id*. at 2.  Plaintiffs responded

---

[1] The letter is mis-dated "June 6, 2008."  The parties agree that it was sent on June 25, 2008.

3

on August 15, 2008, by sending Defendant yet another revised version of the settlement agreement. *Id.* at Ex. A-8. By letter dated August 19, 2008, Defendant informed Plaintiffs that it found the proposed August 15 changes unacceptable because Defendant believed they were outside the scope of the material terms of the settlement agreement. *Id.* at Ex. A-9. At that time, Defendant re-tendered the August 7, 2008 settlement agreement. Defendant states that the parties are now "at an impasse" and therefore, seeks enforcement of the August 7, 2008 settlement agreement. *Id.* at 4.

## II.     Legal Standards

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004) (citation omitted). Because this is a diversity action brought pursuant to 28 U.S.C. § 1332, the Court applies the substantive law of Colorado, the forum state, governing contract formation. *See NY Life Ins. Co. v. KN Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996). Colorado law provides that the essential elements of a contract include "mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration." *Indus. Prods. Int'l, Inc. v. Emo Trans., Inc.*, 962 P.2d 983, 988 (Colo. Ct. App. 1997) (citation omitted). "An offer is a manifestation by one party of a willingness to enter into a bargain," and "acceptance is a manifestation of assent to the terms of the offer." *Id.* (citation omitted). A settlement is a contract to end judicial proceedings, and as such, before a court finds a settlement agreement to be binding and enforceable, it must appear that there was a "meeting of the minds" as to its terms and

4

conditions. *H.W. Houston Constr. Co. v. Dist. Court*, 632 P.2d 563, 565 (Colo. 1981). In addition, before the Court can find that an agreement has been reached, "it must appear that further negotiations are not required to work out important and essential terms." *Id.* (citing Colorado case law). In Colorado, "whether negotiations are sufficiently definite and final to create a binding contract is to be decided by the finder of fact." *Shoels*, 375 F.3d at 1062. That is, "[t]he terms of the settlement agreement must be clear, unambiguous, and capable of enforcement." *City & County of Denver v. Adolph Coors Co.*, 813 F. Supp. 1476, 1479 (D. Colo. 1993).

In addition, Colorado law requires that, in determining whether the parties intended to be bound by agreement before execution of a written instrument, the Court must examine the following four factors:

> (1) whether the parties have stated an intention not to be bound absent an executed writing, (2) whether one party has performed partially and the other party has accepted such performance, (3) whether there are no issues left to be negotiated such that the signing of the contract is merely ministerial, and (4) whether the agreement concerns complex business matters such that a written agreement would be the norm, not the exception.

*Coors*, 813 F. Supp. at 1481 (citation omitted). Finally, courts have indicated a strong policy favoring dispute resolution rather than protracted litigation. As long as "the terms of the settlement agreement [are] clear, unambiguous, and capable of enforcement" and the parties have reached a meeting of the minds, resolution of claims by settlement is preferred. *Id.* at 1479; *see also United Mine Workers Dist. No. 5 v. Consolidation Coal Co.*, 666 F.2d 806, 810 (10th Cir. 1981).

**III.    Analysis**

Defendant argues that the Court should "summarily enforce the parties' settlement agreement as fully reflected in the August 7, 2008 form of agreement because it encompasses all the material terms of the parties' settlement agreement." *Motion* [#76] at 4. Defendant contends that Plaintiffs "offered 'to resolve the current litigation' in [their] June 13, 2008 letter. [Defendant] accepted [Plaintiffs'] offer on June 25, confirming that the parties 'agreed in principle to a settlement' after the parties clarified four parts of [Plaintiffs'] offer the previous day. The parties' overt acts and words, as set forth in the June 2008 correspondence, govern this Court's determination of the parties' mutual asset to the settlement agreement." *Id.* Plaintiffs argue that enforcement of the August 7, 2008 settlement agreement would be unfair, as it allegedly contains "self-serving, one-sided terms [Defendant] proposed during the negotiation of a document that was to formally memorialize the June 25 settlement - terms to which [Plaintiffs have] never agreed and which have been hotly contested through the course of the negotiations." *Response* [#83] at 2-3. Instead, Plaintiffs argue that because the parties do not dispute that the essential terms were agreed to on June 25, 2008, the Court should enforce the terms as set forth in correspondence of that date.[2]  *Id.* at 3.

The parties agree that the following settlement terms are undisputed: (1) Plaintiffs will pay Defendant the amount of $22,500.00; (2) Plaintiffs will dismiss with prejudice their claims against Defendant in the instant lawsuit; (3) Defendant will dismiss with prejudice

---

[2] Plaintiffs' request is improper pursuant to D.C.COLO.LCivR. 7.1(C), because it was included in their response to Defendant's original motion.  Nevertheless, for purposes of completeness and clarity, the Court elects to consider it.

6

its counterclaim against Plaintiffs in the lawsuit. *Response* [#83] at 6; *Reply* [#84] at 6-10. As specified by the parties, the remaining terms at issue are the release terms, the term related to the non-disclosure agreement ("NDA"), and the terms relating to the nature and scope of Defendant's work. *See id.*

Relying on the Colorado Court of Appeals holding in *Yaekle v. Andrews*, 169 P.3d 196 (Colo. Ct. App. 2007), Defendant argues that a "rational basis" exists for enforcement of the settlement agreement including its version of the disputed terms, as set forth in the August 7th draft. *Reply* [#84] at 3. In *Yaekle*, the parties reached a "basic settlement" after participating in mediation. *Yaekle*, 169 P.3d at 197. The parties then notified the court that a settlement had been reached, and a draft of the formal settlement agreement was circulated. *Id.* at 198. Later, the parties came to dispute "whether the terms of the prepared formal settlement agreement accurately reflected the terms of their basic settlement agreement" as agreed upon at the mediation, and the trial court later granted a motion to enforce the settlement agreement filed by the defendant. *Id.* In upholding the trial court's conclusion that an enforceable settlement agreement existed, the Colorado Court of Appeals noted that "plaintiff's attorney never challenged, in his exchange of correspondence with defendants either before or after the December agreement, the [contested] formal settlement provisions . . . ." *Id.* at 199. The *Yaekle* court further noted that the formal settlement agreement incorporated certain of the plaintiff's terms verbatim, and that therefore, these terms were fully enforceable. *Id.* In conclusion, the *Yaekle* court found that "the parties' agreement was reduced to formal documents as required by the

[basic] settlement agreement . . . [and] the parties and their attorneys approved the agreement through their conduct and representations to the trial court," and therefore, a valid, enforceable settlement agreement existed. *Id.* at 200 (citing *Scoular Co. v. Denney*, 151 P.3d 615, 619 (Colo. Ct. App. 2006)).

*Yaekle* is controlling precedent in this situation, and establishes a useful blueprint for analysis of the issue of whether an enforceable agreement was reached by the parties. Accordingly, the Court examines the actions and correspondence of the parties preceding and following the August 7th settlement agreement in order to determine whether they reached agreement as to the terms that remain contested.

    **1.**    **The Release Terms**

Plaintiffs argue that the agreed-upon release terms were as follows: "[Plaintiffs] release [Defendant] from any liability relating to [their] claims in the lawsuit (including any rights to costs associated therewith)," and "[Defendant] releases [Plaintiffs] from liability relating to its counterclaims in the lawsuit (including any rights to costs associated therewith)." *Response* [#83] at 11. Defendant contends that this summary "mis-characterizes the release terms of the parties' agreement." *Reply* [#84] at 6. Defendant argues that Plaintiffs never limited the release to "claims in the lawsuit," and that the parties agreed that they would exchange general mutual releases, which by definition, are not limited to claims in the lawsuit. *Id.* at 7. As proof of the parties' broader agreement in this regard, Defendant states that on August 15th, Plaintiffs sent a proposed settlement agreement to Defendant that contained a general mutual release, and that the August 7th

8

settlement agreement previously tendered to Plaintiffs by Defendant contains "the exact mutual release language that [Plaintiffs tendered] on August 15." *Id.* at 7 (emphasis in original).

In the June 25, 2008 clarification letter, Defendant stated that the settlement agreement was to contain "general mutual releases." *Motion* [#76] at Ex. A-3, p. 3. There is no evidence in the record that Plaintiffs ever disputed that general mutual releases were to be a part of the formal settlement agreement. Indeed, the Court has examined the proposed settlement agreement tendered by Plaintiffs on August 15, 2008 and the proposed settlement agreement tendered by Defendant on August 7, 2008, and finds that Defendant's August 7, 2008 settlement agreement contains the exact general mutual release terms that Plaintiffs also tendered on August 15, 2008. *Compare Reply* [#84] at Ex. A-15, pgs. 5-6, *with Motion* [#76] at Ex. A-7, p. 4. Accordingly, the Court finds that Plaintiffs have no basis for arguing that the release terms were not agreed upon. *See Yaekle*, 169 P.3d at 200. Based on these two separately drafted documents, there was a "meeting of the minds" as to this term, *H.W. Houston*, 632 P.2d at 565, and the term is "clear, unambiguous, and capable of enforcement." *Coors*, 813 F. Supp. at 1479.

    **2.    The Non-Disclosure Term**

Plaintiffs argue that the agreed-upon non-disclosure term was as follows: "[Defendant will] execute an agreement stating that the [parties' previously-executed NDA] is valid and continues to protect [Plaintiffs'] trade secrets from unauthorized disclosure or use." *Response* [#83] at 11. Defendant argues that the August 7th proposed settlement

agreement defines Plaintiffs' "'proprietary information' or 'trade secrets' in a manner that tracked the language [Plaintiffs] used in the [original] non-disclosure agreement," and that it further "addressed the non-disclosure issue in accordance with the parties' June 2008 agreement." *Reply* [# 84] at 4.

Defendant's June 25, 2008 clarification letter states that "the non-disclosure issue will be addressed in the settlement agreement . . . ." *Motion* [#76] at Ex. A-3, p. 3. There is no evidence in the record that the parties agreed that the non-disclosure issue was to be addressed in an agreement separate from the settlement agreement. Further, the Court has examined Plaintiffs' August 15th settlement agreement, which does not contain a clause stating that Defendant was to execute a separate agreement stating that the original "NDA" was valid. *Id.* at Ex. A-15. Indeed, even though Plaintiffs argue that "Defendant unilaterally decided to integrate into the Initial Draft a provision which provided that '[s]ection 2.4 of the Settlement Agreement replaces and supersedes any other non-disclosure agreement allegedly in place between the Parties, including but not limited to the [NDA],'" *Response* [#83] at 7, the Court notes that the settlement agreement tendered by Plaintiffs on August 15th also contains this exact language. *See Reply* [#84] at Ex. A-15, p. 6, § 2.4. Indeed, regarding the non-disclosure issue, the August 7th agreement and the August 15th agreement are nearly identical. There is only one slight variation: while Plaintiffs' August 15th agreement makes reference to a "Disputed Disclosure List," Defendant's August 7th agreement contains no reference to such a list. *See id.* at p. 6, *Motion* [#76] at Ex. A-7, p. 5.

10

Defendant argues that this Disputed Disclosure List is "a document [Plaintiffs] made up during litigation." *Reply* [#84] at 4.  It is clear that the Disputed Disclosure List was not part of the original NDA.  *Motion* [#76] at Ex. A-13; *Response* [#84] at Ex. 3.  Further, none of the June documents submitted to the Court make any mention of a "Disputed Disclosure List," and Plaintiffs' Response makes no argument that the parties ever discussed or reached an agreement as to the inclusion of a "Disputed Disclosure List" in the settlement agreement.  *See Response* [#83].  Accordingly, the Court has no trouble finding that there was a "meeting of the minds" regarding non-disclosure, and that the August 7th settlement agreement addresses the non-disclosure terms as the parties agreed.  *H.W. Houston*, 632 P.2d at 565.  Further, these terms are "clear, unambiguous, and capable of enforcement." *Coors.*, 813 F. Supp. at 1479.

### 3. Terms Regarding the Nature and Scope of Defendant's Work

Defendant contends that the settlement agreement was always supposed to include "recitals related to the nature and scope" of its work.  *Motion* [#76] at 8, n. 2.  Plaintiffs now argue that the Court may omit such terms in enforcing the purported June 25th settlement agreement, as they argue that "such recitals would be of no legal consequence to the disposition of the parties' claims . . . ."  *Response* [#83] at 12.  However, in its June 25, 2008 clarification letter, Defendant stated that the settlement agreement was to "include recitals related to the nature and scope of [Defendant's] work; . . . ."  *Motion* [#76] at Ex. A-3, p. 3.  Plaintiffs did not disagree.  The August 7th settlement agreement contains language describing the scope of Defendant's marketing efforts at Section 3.5.  *Id.* at Ex.

A-7, p. 5. Plaintiffs' August 15th settlement agreement also contains language describing the scope of Defendant's marketing efforts at Section 2.5. *Reply* [#84] at Ex. A-15, p. 7. The language of these paragraphs is nearly identical, thus reflecting considerable agreement between the parties about Defendant's marketing efforts in the future. The only difference between the two paragraphs relates to part (b) of Defendant's August 7th recital, which allows Defendant to display products including shotgun blanks or barrels in its marketing materials, "so long as the product does not *disclose* in any way Lippard's Proprietary information," while part (b) of Plaintiffs' August 15th recital permits the same displays, "so long as the product is not *based* in any way upon Lippard's Proprietary Information." *Motion* [#76] at Ex. A-7, p. 5; *Reply* [#84] at Ex. A-15, p. 7 (emphasis provided).

The Court finds that this variation in wording is not sufficient to preclude a finding that there was a "meeting of the minds" as to this term. *H.W. Houston*, 632 P.2d at 565. First, although the June documents contemplated the mere confirmation of the terms of the parties' original Non-Disclosure Agreement, that document does not contain any language addressing marketing displays or use of Plaintiffs' Proprietary Information in such displays. *Motion* [#76] at Ex. A-13; *Response* [#84] at Ex. 3. Manifestly, the parties' decision to address marketing efforts was made between the dates of the June documents and the August 7th draft of the settlement agreement. Regardless, it is apparent that the parties did eventually agree that Defendant's marketing efforts could include displays of certain products such as shotgun blanks or barrels, because both Defendant's August 7th draft of

12

the settlement agreement and Plaintiffs' August 15th draft of the settlement agreement so indicate. The difference between displays which "disclose" Plaintiffs' Proprietary Information, as it is defined in the settlement agreement, and those which are "based upon" such Information is so trivial as to be immaterial. The disputed language of the settlement agreement is not about what information constitutes Proprietary Information – neither party argues that the definition of such information is a disputed term. At most, the disputed language relates to how Defendant's marketing efforts can use such information. Based upon the parties' course of dealing and the precise language at issue, I do not find that the marketing displays provision is a material term of the settlement agreement. *See Yaekle*, 169 P.3d at 199-200; *Scoular*, 151 P.3d at 619. Any purported dispute about it, therefore, does not preclude a finding that an enforceable agreement was reached. *H.W. Houston*, 632 P.2d at 565. Second, Plaintiffs' attempt to tweak the language proposed by Defendant in the August 7th agreement is a belated rejection of a broader term to which they had already agreed. After the June 25th clarification letter, Plaintiffs agreed that the settlement agreement would contain language about the scope of Defendant's work *as proposed by Defendant*. Apparently once Plaintiffs reviewed that language, although they agreed to include certain promises related to Proprietary Information that were not contained in the original Non-Disclosure Agreement, they thought better of allowing Defendant to define the "scope" of its marketing displays as set forth in the August 7th agreement. Such second thoughts do not negate Plaintiffs' previous agreement that the settlement document would contain language about the nature and scope of Defendant's work. Accordingly, the Court

finds that Plaintiffs have no legitimate basis for arguing that the marketing display language was not agreed upon. *See Yaekle*, 169 P.3d at 200. This term of the settlement agreement is "clear, unambiguous, and capable of enforcement." *See Coors*, 813 F. Supp. at 1479.

Therefore, the Court finds that the three terms now disputed by Plaintiffs were agreed upon by the parties by the time of the August 7, 2008 settlement agreement. Pursuant to Colorado law, the essential elements of a contract are "mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration." *Indus. Prods. Int'l*, 962 P.2d at 988. An offer is a manifestation by one party of a willingness to enter into a bargain, and acceptance is a manifestation of assent to the terms of the offer. *Id.* (citation omitted). The Court finds that Plaintiffs offered to "resolve the current litigation" in their June 13, 2008 letter. *Motion* [#76] at Ex. A-2. Defendant then accepted Plaintiffs' offer in its June 25, 2008 letter, by confirming that the parties "agreed in principle to a settlement" on the "material terms," and providing clarification on four additional issues. *Id.* at Ex. A-3. As explained above, the parties' later drafts of the settlement agreement establish that the clarifications were also agreed upon. Indeed, Plaintiffs do not dispute that the clarifications did not change any material term of the parties' agreement. *Response* [#83] at 5-6. Therefore, it appears that a settlement agreement was reached at or about the time of the August 7th letter, and that "further negotiations [were] not required to work out important and essential terms." *NY Life Ins. Co.*, 80 F.3d at 409. The Court finds that the negotiations of the parties were "sufficiently

definite and final" such that a binding contract was created.  *See Shoels*, 375 F.3d at 1062.  Further, like the circumstances in *Yaekle*, where the parties reached a basic settlement and then later disagreed on the terms, it is clear that the disputed terms of the August 7, 2008 settlement agreement were accepted and included, verbatim, by Plaintiffs in their August 15, 2008 settlement agreement, or were proposed by Defendant in its June 25, 2008 clarification letter, and not opposed by Plaintiffs.  As such, Plaintiffs are in no position to now argue that agreement was not reached as to these terms.  *See Yaekle*, 169 P.3d at 200.  There was clearly a "meeting of the minds" regarding the terms and conditions of the August 7, 2008 settlement agreement, and Plaintiffs cannot now avoid its enforcement.  *H.W. Houston*, 632 P.2d at 565.  The terms of the August 7, 2008 settlement agreement are "clear, unambiguous, and capable of enforcement."  *Coors*, 813 F. Supp. at 1479.  Likewise, because the August 7th agreement does not, in fact, contain material terms to which Plaintiffs did not agree, and because it reflects at least one term agreed upon after the June 25, 2008 letter, their argument that the Court should enforce the purported June 25, 2008 agreement lacks merit.

Finally, Colorado law dictates that in determining whether the parties intended to be bound by agreement before execution of a written instrument, the Court must examine the four factors set forth in *Coors*.  *See id.* at 1481.  The first factor weighs in favor of enforcement of the August 7th settlement agreement because there is no evidence that the parties, or Plaintiffs in particular, stated an intention not to be bound absent an executed writing.  *See id.*  The second factor is inapplicable here, because it does not appear that

either party has partially performed any aspect of the August 7th settlement agreement. *See id.* The third favor weighs strongly in favor of Defendant, because no further negotiations were needed in order to clarify additional or essential terms and the signing of the agreement was a mere formality, as the parties had already agreed on its contents. *See id.* Finally, although a written agreement would be the norm in such circumstances, the parties' exchange of documents indicates that they intended to execute one that reflected the agreed-upon terms. Plaintiffs' failure to do so appears to be the result of second thoughts which occurred after they manifested an intention to be bound. Accordingly, I do not find that this factor weighs in favor of either party. *See id.; Woods v. Denver Dep't of Revenue, Treasury Div.*, 45 F.3d 377, 378 (10th Cir. 1995) (noting that "a party who knowingly and voluntarily authorizes the settlement of [his] claims cannot avoid the terms of the settlement simply because [he] changes [his] mind.").

The balance of the *Coors* factors indicate that the parties intended to be bound by the agreement they reached through negotiation, as reflected in the August 7, 2008 draft tendered by Defendant. *See id.* Therefore, the Court concludes that an enforceable agreement was reached between the parties here, and considering that resolution of claims by settlement, rather than protracted litigation, is preferred, the August 7, 2008 settlement agreement should be enforced. *See id.* at 1479.

IV. **Conclusion**

As set forth above, I respectfully **RECOMMEND** that **Defendant Specialty Bar Products Company's Motion to Enforce Settlement Agreement** [Docket No. 76; Filed

August 20, 2008] be **GRANTED**. Accordingly, I **RECOMMEND** finding that a settlement agreement, as reflected in Defendant's August 7, 2008 draft agreement, was entered into by the parties effective that date.

FURTHER, IT IS **ORDERED** that pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this Recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the Recommendation by the district judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *In re Key Energy Resources Inc.*, 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this Recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996).

BY THE COURT:

__s/ Kristen L. Mix_____

United States Magistrate Judge

Dated: January 5, 2009